**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

CLEAN LABEL PROJECT FOUNDATION,

Plaintiff,

v.

ABBOTT LABORATORIES, INC.,

Defendant.

Civil Action No. 21-cv-3247 (BAH)

Chief Judge Beryl A. Howell

<u>**MEMORANDUM OPINION**</u>

This case about product labeling is *itself* difficult to label.  It is not exactly a case about product safety, but about whether an allegedly unsafe component of a product renders misleading advertising materials suggesting that the product is beneficial.  It is not exactly a case about federal law, but it looks to federal agency guidance as to what a product can or cannot safely contain.  It is not exactly a class action, but is brought by a representative named plaintiff organization on behalf of a large number of non-participating members of the general public.  It is not exactly a case seeking money damages, but plaintiff's pleadings, as framed, could require the expenditure of substantial funds to effectuate the relief sought.

Pending before the Court is plaintiff's motion to remand this quirky case to D.C. Superior Court following its removal here by defendant.  For the reasons explained below, plaintiff's motion to remand is granted and two other pending motions are denied as moot.

**I.      BACKGROUND**

Plaintiff Clean Label Project Foundation describes itself as a "non-profit public interest organization whose mission is to educate the public and enable consumers to make informed shopping choices."  Compl. ¶ 46, ECF No. 1-1.  In service of that mission, plaintiff "uses state-of-the-art laboratory testing to identify the best and worst labeled products," publicly publishes

1

its findings, and in so doing hopes to "reduc[e] contamination across all consumer products." *Id.*
¶¶ 48–49.

Contaminants of interest to plaintiff include lead, a "known neurotoxin," and cadmium, a
"known neurotoxin and osteotoxin." *Id.* ¶ 25.  Plaintiff cites statements by an assortment of
government and private organizations in support of a general scientific consensus that "there is
no safe level of lead for children," *id.* ¶ 30, and alleges various facts pertaining to the myriad
adverse physiological effects of lead, *id.* ¶¶ 57–75.  Plaintiff similarly alleges facts related to the
adverse effects of cadmium, but without citing any statements by U.S. government agencies.  *Id.*
¶¶ 27–29, 76–86.

One item in defendant's expansive product portfolio is Similac Alimentum Infant
Formula for Food Allergies and Colic (12.1 oz) ("Alimentum").  Compl. ¶ 23.  Alimentum is
part of defendant's broader Similac line of infant formula products marketed as having benefits
pertaining to "brain development," "bone development," and "immune support."  *Id.* ¶¶ 11–16.
Defendant also markets Similac products with such slogans as "We promise to give your baby
the best" and "Nearly a century of keeping promises."  *Id.* ¶¶ 99–100.  To evaluate Alimentum,
plaintiff purchased an amount of the product for analysis by a third-party laboratory.  *Id.* ¶ 24.
According to plaintiff, that analysis showed that the purchased Alimentum sample "contains
dangerous levels of" lead and cadmium, which it asserts shows that these contaminants "are
present in [Alimentum], or at a minimum, that [defendant] makes no efforts to confirm that they
are absent."  *Id.* ¶¶ 25–26.  Specifically, testing in September 2021 showed that the Alimentum
purchased by plaintiff contained a lead content of 3.5 parts per billion ("ppb") and a cadmium
content of 5.2 ppb.  *Id.* ¶¶ 107–112.  According to plaintiff, this type of contamination is

incompatible with defendant's descriptions of Alimentum as promoting "brain development," "bone development," and "immune support." *See id.* ¶¶ 26, 31–40, 66, 70, 72, 75, 81–86, 97.

Based on these findings, on October 1, 2021, plaintiff filed a complaint in D.C. Superior Court alleging, in a single count, that defendant violated the D.C. Consumer Protection Procedures Act ("CPPA"), D.C. Code § 28-3901 *et seq.* Compl. ¶ 123. The Complaint is styled as a "representative action claim on behalf of [plaintiff] and the general public of the District of Columbia," pursuant to D.C. Code § 28-3905(k)(1–2). Compl. ¶ 123. Plaintiff alleges that because Alimentum contains detectable amounts of lead and cadmium, defendant's marketing statements mislead or fail to inform consumers with respect to "material facts about" Alimentum. *See generally id.* ¶¶ 114–34. Additionally, plaintiff alleges a further CPPA violation because Alimentum is "adulterated," as defined by D.C. Code § 48-103, due to the presence of the harmful metals lead and cadmium. *See* Compl. ¶¶ 125–26, 135. On December 10, 2021, defendant timely filed a Notice of Removal, ECF No. 1, to this Court.[1]

Plaintiff timely filed the instant Motion to Remand to D.C. Superior Court ("Pl.'s Mot."), ECF No. 8, on January 10, 2022.[2] During briefing on the motion to remand, on January 31, 2022, defendant filed the also-pending motion to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). Def.'s Mot. Dismiss Failure State Claim, ECF No. 11. The motion to dismiss was accompanied by a Request for Judicial Notice, ECF No. 11-3, concerning 22 exhibits from various public sources. Before filing its opposition to the motion to

---

[1]    A notice of removal must be filed within 30 days of service of the summons and complaint on defendant. 28 U.S.C. § 1446(b)(1). Here, the Complaint was filed on October 1, 2021, with service effected on November 17, 2021. Notice of Removal ¶ 2. Accordingly, the December 10, 2021, notice of removal falls within the authorized 30-day timeframe.

[2]    A motion to remand for lack of subject matter jurisdiction may be made "at any time before final judgment." 28 U.S.C. § 1447(c). Furthermore, the motion complies with the 30-day deadline for a motion to remand for any other reason, *see id.* Thirty days after December 10, 2021, was Sunday, January 9, 2022. Thus, the deadline was Monday, January 10, 2022, the date the instant motion was filed.

dismiss, plaintiff filed, on February 21, 2022, a Motion to Strike Defendant's Requests for Judicial Notice, ECF No. 14, seeking to strike a declaration filed with the motion to dismiss, the request for judicial notice, the 22 sundry exhibits thereto, and "all arguments relying on those documents," *id.* at 2.  Briefing on the trio of interlocking motions was completed on March 14, 2022.

On May 11, 2022, review by the Court identified a possible lack of diversity of citizenship between the parties on account of both named parties appearing to be incorporated in Delaware, and directed the parties to file a supplemental report clarifying the citizenship of the parties.  *See* Min. Order (May 11, 2022).  The parties responded in a joint statement on May 13, 2022.  Joint Statement Resp. May 11, 2022 Order ("Joint Statement"), ECF No. 20.  All pending motions are now ripe for disposition.

## II.  LEGAL STANDARD

"[A]ny civil action brought in a State court of which the district courts of the United States have original jurisdiction[] may be removed by the defendant . . . to the district court of the United States for the district and division embracing the place where such action is pending."  28 U.S.C. § 1441(a).  "When it appears that a district court lacks subject matter jurisdiction over a case that has been removed from a state court, the district court must remand the case, and the court's order remanding the case to the state court whence it came 'is not reviewable on appeal or otherwise.'"  *Republic of Venezuela v. Philip Morris Inc.*, 287 F.3d 192, 196 (D.C. Cir. 2002) (citing 28 U.S.C. § 1447(c) and quoting *id.* § 1447(d)); *see also Kircher v. Putnam Funds Tr.*, 547 U.S. 633, 640 (2006) (noting the "policy of Congress oppos[ing] interruption of the litigation of the merits of a removed cause by prolonged litigation of questions of jurisdiction of the district court to which the cause is removed," resulting in statutes that "have

accordingly limited the power of federal appellate courts to review orders remanding cases removed by defendants from state to federal court" (internal quotation marks and citation omitted) (citing 28 U.S.C. § 1447(d))).  Due to the statutory prohibition of most appellate review of remanded cases, the legal standard for removal has largely been developed in the district courts.

Defendants seeking the exercise of federal court jurisdiction over a removed case "bear[] the burden of pleading" the basis for jurisdiction.  *Novak v. Capital Mgmt. & Dev. Corp.*, 452 F.3d 902, 906 (D.C. Cir. 2006) (citation omitted); *Apton v. Volkswagen Grp. of Am., Inc.*, 233 F. Supp. 3d 4, 11 (D.D.C. 2017).  Absent such a showing, a "court must remand the case." *Johnson-Brown v. 2200 M Street LLC*, 257 F. Supp. 2d 175, 177 (D.D.C. 2003) (citing 28 U.S.C. § 1447(c)).  "In light of the significant federalism concerns involved, this court 'strictly construes the scope of its removal jurisdiction,'" *RGI Events & Pub. Rels., LLC v. Al Qurm Mgmt. Consultancy*, No. 18-cv-1828 (BAH), 2019 WL 935498, at *2 (D.D.C. Feb. 26, 2019) (quoting *Moses v. SunTrust Mortg., Inc.*, No. 11-cv-00822, 2012 WL 113375, at *2 (D.D.C. Jan. 13, 2012) (quoting *Breakman v. AOL LLC*, 545 F. Supp. 2d 96, 100 (D.D.C. 2008))), resolving "any ambiguities concerning the propriety of removal in favor of remand," *Animal Legal Def. Fund v. Hormel Foods Corp.*, 249 F. Supp. 3d 53, 56, 61 (D.D.C. 2017) (quoting *Johnson-Brown*, 257 F. Supp. 2d at 177).

## III.  DISCUSSION

Defendant asserts three independent bases for removal: (1) the Complaint "raise[s] substantial questions of federal law" both by relying on "federal regulatory bodies" for the assertion that there is "no known safe level" of lead and cadmium, Notice of Removal ¶¶ 9–14, and because federal law governs the contents and labeling of infant formula, *id.* ¶¶ 15–20;

(2) diversity jurisdiction lies under the Class Action Fairness Act ("CAFA"), Pub. L. No. 109-2, 119 Stat. 4, Notice of Removal ¶ 22–30; and (3) even if CAFA is inapplicable and only a single plaintiff is named, the parties are completely diverse and the $75,000 amount in controversy threshold is met by considering the expected total cost of injunctive relief, Def.'s Opp'n Pl.'s Mot. Remand ("Def.'s Opp'n") at 27–32, ECF No. 12.  Each proposed basis for jurisdiction is examined in turn, and each fails.

### A.     Federal Question

Defendant argues that the sole CPPA claim in the Complaint "depends upon [plaintiff's] representation of federal law" because a "necessary, disputed, and substantial question to [plaintiff's] affirmative theory of relief is whether federal law actually does consider *any* (even trace) quantity of metal in food to be detrimental."  Def.'s Opp'n at 8–9 (emphasis in original) (citing *Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 314 (2005)).  This strained attempt to transform *scientific observations* made informally by a federal agency into a question of federal *law* is meritless.

Defendant's argument centers on the Complaint's allegation that defendant "deceived D.C. consumers into believing that [Alimentum] supported 'brain health' when it contained avoidable levels of multiple deleterious neurotoxins with *no known safe level* in a product intended for use during a critical period of neurodevelopment."  Def.'s Opp'n at 9 (emphasis in original) (quoting Compl. ¶ 40).  The premise "that there is 'no known safe level' of lead and cadmium" is, defendant asserts, a "necessary allegation" in the Complaint—one that is principally supported by reliance on "statements of federal regulators."  *Id.* (citing Compl. ¶¶ 30, 73).

Plaintiff counters that the Complaint neither pleads any federal cause of action nor "attempt[s] to conceal any federal argument" in its CPPA claim.  Pl.'s Mot. at 25–26.  Plaintiff's

sole claim, rather, is that defendant engaged in deceptive marketing and advertising under CPPA because Alimentum allegedly does not in fact support healthy infant development as promised, due to its inclusion of "detectible amounts of neurotoxins and osteo-toxins, including lead and cadmium." *Id.* at 26 (citing Compl. ¶¶ 11, 23, 41, 123, 134).  Nowhere does the Complaint allege that either the Alimentum product or its labeling and marketing actually violates any federal law or regulation.

In *Grable & Sons Metal Products, Inc. v. Darue Engineering & Manufacturing*, 545 U.S. 308 (2005), the Supreme Court reaffirmed "the commonsense notion that a federal court ought to be able to hear claims recognized under state law that nonetheless turn on substantial questions of federal law," *id.* at 312.  The Court has synthesized its "arising-under" jurisprudence pertaining to state law claims with a four-part test: "federal jurisdiction over a state law claim will lie if a federal issue is: (1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress." *Gunn v. Minton*, 568 U.S. 251, 258 (2013).  This rule admits only a "special and small category" of state-law cases to federal court.  *Empire Healthchoice Assurance, Inc. v. McVeigh*, 547 U.S. 677, 699 (2006); *see also Merrell Dow Pharms. Inc. v. Thompson*, 478 U.S. 804, 813 (1986) ("[T]he mere presence of a federal issue in a state cause of action does not automatically confer federal-question jurisdiction.").  This case lies well outside that narrowly circumscribed category, as defendant's removal attempt falters on the "necessarily raised" prong of the *Grable*/*Gunn* test.

Defendant argues that plaintiff's "allegation that there is 'no safe' level of metal whatsoever in infant foods and blood" is "a necessary element of [plaintiff's] theory."  Def.'s Opp'n at 2.  That much is true.  Plaintiff alleges that commissioned laboratory tests found that

Alimentum "contains dangerous levels of known neurotoxin lead and known neurotoxin and osteotoxin cadmium," Compl. ¶¶ 24–25, to the tune of 3.5 parts per billion and 5.2 parts per billion, respectively, *id.* ¶¶ 109, 112.  From those findings plaintiff concludes that Alimentum "is adulterated" as a matter of D.C. law as "the avoidable presence of these contaminants directly contradict the 'brain development,' 'bone development[,]' and 'immune support' functions touted by" defendant.  *Id.* ¶ 36.  The sole "benchmark" plaintiff offers as to what constitutes a harmful amount of lead is, effectively, zero, based on assessments by the Environmental Protection Agency ("EPA"), Food and Drug Administration ("FDA"), World Health Organization ("WHO"), Centers for Disease Control and Prevention ("CDC"), American Medical Association ("AMA"), and American Academy of Pediatrics ("AAP"), who "have all independently stated that there is no safe level of lead for children."  *Id.* ¶ 30.  Given that plaintiff alleges that a detectable, if small, level of lead in Alimentum has harmful effects, contrary to defendant's marketing representations, the "no safe level" standard is indeed a "necessary element" of plaintiff's theory of CPPA liability.

Defendant does not explain, however, why it is necessary for the "no safe level" standard to exist as a matter of *federal law* for plaintiff's allegations to survive, nor for that matter why the federal agencies' assessments cited in the Complaint are "law" at all.  First, among the six authorities the Complaint cites as effectively advancing the "no safe level" perspective, half of them are not federal agencies at all.  *See* Compl. ¶ 30.c (WHO); *id.* ¶ 30.e (AMA); *id.* ¶ 30.f (AAP).  Furthermore, out of the six quoted authorities, three are arguably inapposite as they indicate only that there is no safe level of lead found in blood, a distinct question from what level of *exposure* is or is not safe.  *See id.* ¶ 30.b, 30.c, 30.d.[3]  Out of the three remaining quotations

---

[3]      As a logical matter, the link between a child's exposure to an amount of lead, however small, and any resulting level of lead in the child's bloodstream would seem to involve an intermediate allegation about absorption

that speak to lead exposure in terms other than blood levels, only one comes from a federal entity—the EPA, *id.* ¶ 30.a—whereas the other two come from private groups—the AMA, *id.* ¶ 30.e, and the American Academy of Pediatrics, *id.* ¶ 30.f.  In any event, regardless of which of the six statements are deemed relevant, the point remains that federal sources do not even make up the majority of the support in the Complaint for the proposition that no amount of lead is safe.  Furthermore, plaintiff offers several pages of additional allegations and citations to sources on the dangers of lead and cadmium, almost none of which relies on government sources, *id.* ¶¶ 57–86, rendering the federal agency statements even less "necessary."

Given that plaintiff's CPPA claim is predicated on multiple sources opining that the presence of lead and cadmium renders a product unsafe, rather than only because the federal government says so in a legally binding form, this level of reliance on federal authority cannot reasonably be viewed as "necessary" to the Complaint.[4]

---

processes, a link which defendant itself points out is missing in the Complaint.  Def.'s Opp'n at 1 ("CLP is . . . wrong about the science. . . . CLP fails to plead facts plausibly showing that the trace quantities of lead or cadmium alleged in Alimentum *do* raise the blood levels of lead or cadmium in infants." (emphasis in original)).  Indeed, defendant repeatedly seizes on this missing link in support of its pending motion to dismiss.  *See* Def.'s Mem. Supp. Mot. Dismiss at 7, ECF No. 11-1 ("Yet the Complaint does *not* allege that trace lead or cadmium in Alimentum is sufficient to raise infant blood levels of lead or cadmium." (emphasis in original)); *see also id.* at 16, 19, 20, 21, 31.  All that said, even if all of the quoted federal agency statements are credited as relevant, none of them present determinations of federal law.

[4]      The "well-pleaded complaint" rule yields the same result.  It is well settled that "extraneous material" beyond what is needed to state a claim is to be ignored by a court evaluating "arising-under" federal question jurisdiction.  *See* 13D WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE: JURISDICTION § 3566 (3d ed., Apr. 2022 update).  Just as extraneous material such as "background facts" cannot be pleaded for the sake of manufacturing federal question jurisdiction, a defendant also cannot remove an action simply because the plaintiff included such extraneous material.  *See Franchise Tax Bd. of Cal. v. Construction Laborers Vacation Tr. for S. Cal.*, 463 U.S. 1, 8 (1983) ("If it appears before final judgment that a case was not properly removed, because it was not within the original jurisdiction of the United States district courts, the district court must remand it to the state court from which it was removed.").  Here, plaintiff's central CPPA allegation is that Alimentum is "adulterated" and defendant's statements about the product's healthful benefits are misleading due to the adverse effects of lead and cadmium.  *See generally* Compl. ¶¶ 123–35.  The only facts essential to that pleading are that (a) the product contains the toxic metals and (b) such metals are harmful in any amount, and the Complaint offers sundry non-federal sources for those core allegations.  Anything beyond that, including invocation of the informal statements of regulators, goes to the strength of plaintiff's proof, not to the sufficiency of its allegations.

Notably, neither party points to anything indicating that the agency statements at issue have any force of law.  The statements are better described as scientific observations made by entities that happen to be federal regulators with subject matter expertise.  First, plaintiff quotes an EPA webpage stating that the "Maximum Contaminant Level Goal ['MCLG'] for lead is zero. EPA has set this level based on the best available science which shows there is no safe level of exposure to lead."  Compl. ¶ 30.a (quoting *Basic Information About Lead in Drinking Water*, EPA, https://www.epa.gov/ground-water-and-drinking-water/basic-information-about-lead-drinking-water (last visited May 25, 2022)).  The very same paragraph on the EPA webpage, however, describes MCLGs as "non-enforceable health goals," and EPA goes on to explain why it has *not* set "an enforceable regulation called a maximum contaminant level" for lead.

Second, plaintiff asserts that the FDA has stated "[t]here is no known identified safe blood lead level," Compl. ¶ 30.b, but that statement is traceable only to a now-defunct FDA webpage offering "Questions and Answers on Lead in Foods"—hardly a document with any meaningful legal effect.[5]  Finally, plaintiff correctly quotes the CDC as stating "[n]o safe blood lead level has been identified," *id.* ¶ 30.d, but the statement appears on a 2013 "Factsheet" webpage discussing the purposes behind "[b]iomonitoring studies on levels of lead" that assist in "determin[ing] whether people have been exposed to higher levels of lead than are found in the general population."  *National Biomonitoring Program—Factsheet: Lead*, CDC (last updated

---

[5]     Plaintiff's citation supporting the assertion about the FDA's conclusion of no known safe blood level of lead, takes a circuitous route, citing a 2017 *Charlotte Observer* article, hidden behind an aggressive paywall, discussing an Environmental Defense Fund report that used FDA data to draw conclusions about the prevalence of lead in baby foods.  Compl. ¶ 30.b (citing Teresa Welsh, *Lead Found in 20% of Baby Food, Report Says*, CHARLOTTE OBSERVER (updated June 20, 2017, 8:26 AM), https://www.charlotteobserver.com/news/nation-world/national/article157063044.html).  That article, in turn, quotes a now-defunct FDA webpage with the key statement that "[t]here is no known identified safe blood lead level."  *Id.*  An archived copy from 2017 of said FDA webpage confirms that the agency posted the statement, but also shows that the context was merely an informal list of ten "Questions and Answers on Lead in Foods."  *Questions and Answers on Lead in Foods*, FDA (updated May 9, 2017), *archived copy available at* https://bit.ly/3rZaJhZ.

July 12, 2013), https://www.cdc.gov/biomonitoring/Lead_factsheet.html.  Here again, the CDC's description of the lack of a safe lead level offers motivation for systematic monitoring and detection efforts but falls well short of being a regulation of any kind.  In sum, defendant is incorrect in arguing that plaintiff relies on "representations of federal law and the federal regulatory regime for metals in foods."  Def.'s Opp'n at 9.[6]

Defendant's references to case law where arising-under federal question jurisdiction was found under *Grable* demonstrate both what it means for a case to necessarily depend on a federal issue and the lack of analogy here.  Defendant invokes *Organic Consumers Ass'n v. Hain Celestial Group, Inc.* ("*Hain*"), 285 F. Supp. 3d 100 (D.D.C. 2018), where another Judge on this Court accepted federal question jurisdiction, *see* Def.'s Opp'n at 11.  In *Hain*, the plaintiff alleged CPPA violations based on a product's labeling as "organic" despite containing "synthetic ingredients that are not permitted under the federal Organic Food Production Act of 1990."  285 F. Supp. 3d at 101.  The court dismissed the case on federal preemption grounds, *id.* at 101, and only mentioned federal question jurisdiction—which the parties did not contest, *id.* at 102—in passing in a footnote by reciting the *Grable* standard without further analysis, *id.* at 102 n.2.  The distinction with the instant case is stark: in *Hain*, the alleged CPPA misrepresentation hinged on the use of the federally defined and regulated term "organic," while here no similar reliance on federal law is presented.  Similarly, in *Dooley v. Medtronic, Inc.*, 39 F. Supp. 3d 973 (W.D. Tenn. 2014), the district court allowed *Grable* jurisdiction over a state-law misrepresentation claim concerning marketing of a medical device for off-label use not approved by the FDA.  There too, actual violation of a federal rule was central to the state-law claim.  *See id.* at 983.

---

[6] Indeed, to the contrary, defendant insists that no federal laws or regulations impugn a product with trace amounts of lead or cadmium, *see id.* at 15, and nowhere does the Complaint allege that there are.  Put another way, the parties appear to agree that the case is not controlled by any federal regulation, calling into question the "actually disputed" prong of the *Grable/Gunn* test.

While defendant claims the instant case is similar because plaintiff's allegations rely on "an alleged federal regulatory determination (which Abbott disputes) that any lead or cadmium is not safe," Def.'s Opp'n at 12, no such formal federal "determination" is at issue here, quite unlike the FDA approval requirements at issue in *Dooley*.  Indeed, defendant insists that "FDA regulations do *not* require exclusion of trace—though faintly detectible—levels of lead or cadmium in order to meet FDA's standards for being an infant formula."  Def.'s Opp'n at 14 (emphasis added).  This characterization is irreconcilable with defendant's premise that an FDA "federal regulatory determination" forms a required part of plaintiff's claim.

All told, defendant fails to identify a question of federal law on which plaintiff's CPPA claim turns, let alone any that is "necessary" to its resolution.  To be sure, federal agency statements about no safe level of lead existing have considerable persuasive value as *scientific* authority when assessing the *factual question* whether Alimentum is "unsafe," but the agencies' scientific advice is no different in kind as a legal matter from similar statements by other domestic and international organizations, around which plaintiff also bases its claims.  Accordingly, defendant cannot justify removal by claiming that this action "aris[es] under" federal law.  28 U.S.C. § 1331.[7]

---

[7]     Defendant conflates to some extent the question of removal with the question whether plaintiff's state-law CPPA claim is preempted by a federal regulatory scheme insofar as it concerns the definition of "adulteration."  *See* Notice of Removal ¶¶ 16–18; Def.'s Opp'n at 14–15.  As defendant obliquely acknowledges, *see* Def.'s Opp'n at 15, it is "settled law that a case may *not* be removed to federal court on the basis of a federal defense, including the defense of pre-emption, even if the defense is anticipated in the plaintiff's complaint, and even if both parties concede that the federal defense is the only question truly at issue," *Caterpillar Inc. v. Williams*, 482 U.S. 386, 393 (1987) (emphasis in original).  Accordingly, preemption arguments are irrelevant for the purpose of deciding the instant motion.

B.       **Class Action Fairness Act**

In the alternative, defendant asserts that removal is proper under the Class Action

Fairness Act of 2005 ("CAFA"), Pub. L. No. 109-2, 119 Stat. 4 (codified in scattered sections of

28 U.S.C.).  Notice of Removal ¶ 22.  As relevant here, CAFA confers diversity jurisdiction on

federal district courts over "any civil action in which the matter in controversy exceeds the sum

or value of $5,000,000, exclusive of interest and costs, and is a class action in which any member

of a class of plaintiffs is a citizen of a State different from any defendant," 28 U.S.C.

§ 1332(d)(2)(A), so long as the proposed class includes at least 100 members, *id.*

§ 1332(d)(5)(B).  A "class action," for CAFA purposes, is "any civil action filed under rule 23 of

the Federal Rules of Civil Procedure or similar State statute or rule of judicial procedure

authorizing an action to be brought by 1 or more representative persons as a class action."  *Id.*

§ 1332(d)(1)(B).

Plaintiff contends that this suit is not a "class action" to which CAFA applies but rather a

"representative action under the D.C. CPPA on behalf of the 'general public.'"  Pl.'s Mot. at 8.

Claiming CAFA jurisdiction, then, requires "this Court to treat [plaintiff's] claim as a totally

different lawsuit than the one Plaintiff actually filed in order to transform this case into a class

action lawsuit under CAFA to suit the Defendant's jurisdictional preference."  *Id.*  Defendant

responds by accusing plaintiff of "artful dodging of federal court jurisdiction," Def.'s Opp'n at

16, and insisting that neither the label assigned to an action by a plaintiff or a state nor the form

of pleading the action can take precedence over the essential characteristics of whether the suit

appears to be a class action, *see id.* at 17.  Plaintiff has the better argument as well as the weight

of persuasive and nearly unanimous district court authority on its side.[8]

---

[8]       The analysis that follows concludes that this action is not a "class action" at all for CAFA purposes,
obviating any need to referee the parties' other disagreements relating to CAFA jurisdiction, including (1) whether

Plaintiff brings this case under D.C. Code § 28-3905(k)(1)(C)–(D) as a nonprofit public interest organization on behalf of itself and, acting in the capacity of a private attorney general, "the general public of the District of Columbia."  Compl. ¶¶ 46, 55–56, 123.  Nowhere in the Complaint does plaintiff describe the suit as a "class action," define a putative class, or make any attempt to comply with either the federal Rule 23 or the nearly identical D.C. Rule 23 requirements for a class action.[9]  Nevertheless, the practical effect, if plaintiff prevails, of the declaratory and injunctive relief sought—declaring that defendant is in violation of the CPPA, enjoining the violative conduct, and requiring "corrective advertising," Compl. at 28 (Prayer for Relief), may differ little if at all from the relief that plaintiff would have sought had it elected to bring this suit as a federal class action in the first instance under Rule 23(b)(2).

The parties have cited to no binding authority from either the D.C. Circuit or D.C. Court of Appeals directly addressing whether a CPPA representative action seeking only injunctive relief and brought in a "private attorney general" posture is to be deemed a "class action" within the scope of Rule 23 and/or CAFA.  The analysis that follows, confirmed by persuasive authority, leads to the conclusions that Rule 23's requirements need not apply to such actions, CAFA does not provide a basis for federal jurisdiction over such actions, and this case is not converted into a federal class action simply by seeking injunctive relief for consumers.  Accordingly, this case is not a "class action" for CAFA purposes.

---

the 100-plaintiff requirement is met, *see* Def.'s Opp'n at 19, (2) whether the amount in controversy exceeds $5,000,000, *see* Pl.'s Mot. at 19–22; Def.'s Opp'n at 24–27, (3) whether the "non-aggregation principle" applies in assessing amount in controversy, *see* Pl.'s Mot. at 22–25; Def.'s Opp'n at 27–32, and (4) whether a carveout in CAFA relating to certain "mass actions" that are brought in a private attorney general capacity puts an additional thumb on the scale against the exercise of federal jurisdiction, *see* Pl.'s Mot. at 16; Def.'s Opp'n at 23.

[9]      For simplicity, this Memorandum Opinion uses the term "Rule 23" interchangeably to refer to either or both of Federal Rule of Civil Procedure 23 or D.C. Superior Court Rule of Procedure 23, given that the two Rules do not differ in any relevant respects.

### 1. *Representative Actions for Injunctive Relief*

Defendant's argument rests on the view that in *Rotunda v. Marriott International, Inc.*, 123 A.3d 980 (D.C. 2015), the D.C. Court of Appeals held that a CPPA representative action cannot exist outside the context of Rule 23. Def.'s Opp'n at 20. In *Rotunda*, the court concluded that while the D.C. Council, when enacting the currently operative version of D.C. Code § 28-3905(k)(1) in 2000 allowing representative actions on behalf of the "general public," did not specify "how broadly-contoured actions for damages are to be regulated or managed," 123 A.3d at 984–85, the Council did not evidence an intent to displace the Rule 23 "framework that has governed such suits for decades in the Superior Court" driven by "the unique challenges to procedural fairness and administration posed by a representative suit for damages," *id.* at 989. Accordingly, the *Rotunda* court upheld a Superior Court decision to dismiss a CPPA representative claim for money damages for failure to proceed under the requirements of Rule 23. *See id.* at 982. From that, defendant correctly concludes that as a matter of D.C. law, an action such as that at issue in *Rotunda* must be viewed as a "class action" and is governed by the same rules as a traditional Rule 23 damages action. *See* Def.'s Opp'n at 20–21. Plaintiff does not dispute this conclusion when money damages are involved. *See* Pl.'s Mot. at 11–12.

In defendant's reading, "the logic and reasoning of [*Rotunda*] applies equally to" CPPA representative actions seeking "other forms of relief, including . . . even injunctive relief," based on "[t]he policies of Rule 23, the CPPA, and fundamental due process." Def.'s Opp'n at 21. Plaintiff would not read *Rotunda* so broadly, however, describing the decision as "a very limited opinion that dealt specifically with an action for damages" and asserting that "courts, including the court in *Rotunda*, have repeatedly held that seeking injunctive relief on behalf of the general public does not implicate the class action framework." Pl.'s Mot. at 11. Plaintiff is correct: a

chorus of judges on this Court, including after *Rotunda*, have declined to view CPPA representative suits not seeking money damages as within the aegis of CAFA.

Central to *Rotunda*'s reasoning is the "due process" concern motivating the requirement in a Rule 23 damages action to make reasonable efforts to supply adequate notice of the action to class members whose rights are affected and to offer such persons an opportunity to opt-out from participation.  *See* 123 A.3d at 984–85.  As the *Rotunda* court observed, "outside of detailed structures regulating class actions like those in Rule 23, a procedure binding absent class members who do not affirmatively distance themselves from the suit would present grave due process concerns."  *Id.* at 986.  Additionally, in an action seeking damages, "the manageability of suits brought on behalf of a potentially vast number of plaintiffs" is paramount, including the need to mitigate the risk that plaintiff-specific issues could untenably fragment the class litigation.  *See id.* at 986–87.  These concerns are reflected in the text of Rule 23, requiring that "questions of law or fact common to class members predominate over any questions affecting only individual members," FED. R. CIV. P. 23(b)(3), and that notice be directed to members of a putative Rule 23(b)(3) damages class, *id.* R. 23(c)(2)(B).

CPPA representative actions seeking only injunctive, non-monetary relief do not implicate the same types of due process concerns with respect to members of the general public not participating in the litigation.  Indeed, Rule 23 itself acknowledges as much by allowing class certification where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole," FED. R. CIV. P. 23(b)(2), and indicating that a court "may direct appropriate notice" to such class, *id.* R. 23(c)(2)(A), as opposed to "must" for a damages class, *id.* R. 23(c)(2)(B).  Defendant may be correct that if a CPPA representative action

"putatively affects the legal rights of thousands of D.C. consumers," Def.'s Opp'n at 23, then

such an action may require Rule 23 procedures and federal jurisdiction may lie under CAFA.

The problem for defendant is this action, which is not seeking money damages but rather relief

requiring defendant to disseminate publicly new information, does not "affect[] the legal rights"

of anyone other than defendant itself.  Critically, "[a] suit for damages is not precluded by reason

of the plaintiff's membership in a class for which no monetary relief is sought."  *Norris v.*

*Slothouber*, 718 F.2d 1116, 1117 (D.C. Cir. 1983).  By the same token, here, regardless of the

result in this case after remand, nothing will prevent any D.C. consumer from independently

pursuing statutory or even punitive damages against defendant.  Due process therefore does not

demand that Rule 23 procedures be imposed here.

A consensus among Judges on this Court to have considered, post-*Rotunda*, the

applicability of Rule 23, and thus CAFA, to a CPPA representative action seeking only

injunctive relief has concluded that neither *Rotunda* nor any other authority brings such actions

that have been under review under CAFA's umbrella.  *See Animal Legal Def. Fund v. Hormel*

*Foods Corp.*, 249 F. Supp. 3d 53, 63–65 (D.D.C. 2017) (Kollar-Kotelly, J.) ("[B]ecause Plaintiff

did not bring its case as a class action, and Defendant has not shown that any D.C. law or court

opinion would require Plaintiff's case be treated as such, the Court sees no reason why it would

conclude that Plaintiff has brought a 'class action' for the purposes of CAFA."); *Hackman v.*

*One Brands, LLC*, No. 18-cv-2101, 2019 WL 1440202, at *4 (D.D.C. Apr. 1, 2019) (Kollar-

Kotelly, J.) ("Plaintiff's decision to seek damages for herself does not change the fact that she

seeks only equitable relief for members of the general public. . . . [This] does not present the

same concerns as the *Rotunda* plaintiff's decision to seek damages for members of the general

public."); *Toxin Free USA v. J.M. Smucker Co.*, 507 F. Supp. 3d 40, 45 (D.D.C. 2020)

(Friedrich, J.) (noting that "the *Rotunda* court's concern" is inapplicable where plaintiff "seeks injunctive relief and not damages on behalf of the general public"); *Beyond Pesticides v. Exxon Mobil Corp.*, No. 20-cv-1815, 2021 WL 1092167, at *3 (Kelly, J.) ("[C]ourts in this District have consistently—and persuasively—concluded that suits on behalf of consumers brought under the DCCPPA . . . are 'private attorney general suits' and not class actions as defined by CAFA."). The same result issued in a case involving this same defendant. *Smith v. Abbott Labs., Inc.*, No. 16-cv-501, 2017 WL 3670194, at *2 (D.D.C. Mar. 31, 2017) (Leon, J.) ("In order to establish jurisdiction, Abbott asks me to extend *Rotunda*'s holding to a subset of cases it did not reach. I decline to do so here.").[10]

The collective wisdom reflected in these decisions is compelling, and defendant offers no reason to stray from this well-trod path. While seemingly recognizing that the characterization of a CPPA action seeking only injunctive relief presents an "unanswered question[] of state law," Def.'s Opp'n at 22, defendant assails the *Hackman* opinion's sound observation that no "D.C. law or court opinion would require" the treatment of such a case as a Rule 23 class action, *id.* (quoting *Hackman*, 2019 WL 1440202, at *4), describing this as "an insufficient legal reason for a federal court to refuse to logically extend *Rotunda* to the facts of a new case," *id.* While true that, as defendant points out, federal courts are regularly faced with the task of rendering decisions on unsettled matters of state law, *id.* at 22–23, courts considering this particular issue have in no way shirked that duty as defendant seems to insinuate. To the contrary, other Judges on this Court have thoughtfully considered whether *Rotunda* suggests that the D.C. Court of

---

[10]     Plaintiff perseverates to some extent on the premise that *Breakman v. AOL LLC*, 545 F. Supp. 2d 96 (D.D.C. 2008), is useful authority for the proposition that "CAFA does not establish an alternative basis for federal jurisdiction because a 'representative action' under the [CPPA]" is a creature of D.C. law distinct from a class action, Pl.'s Mot. at 9–10, but this reliance is misplaced because *Rotunda* gives good reason to question whether *Breakman*—a case involving damages for consumers—would still result in remand today. The post-*Rotunda* cases are far more useful as they discuss claims for injunctive relief only and do so in light of *Rotunda*.

Appeals would subject injunction-only CPPA representative actions to Rule 23 requirements, and have soundly concluded that neither *Rotunda* nor the underlying logic motivating *Rotunda* reaches those actions where the injunctive relief sought would be broadly available to the general public.  As such, courts have not "refuse[d] to logically extend *Rotunda*," but instead have considered the matter and determined that *Rotunda* does not in fact "logically" yield the outcome defendant desires here.  This Court agrees.

### 2.  *Relief Sought in This Case*

In this instance, the conclusion that a CPPA representative action not seeking money damages is not subject to Rule 23 or CAFA jurisdiction does not end the discussion, because defendant attempts to concoct a debate as to *whether* this action seeks money damages.  It does not.

As part of its argument in favor of CAFA jurisdiction, defendant repeatedly insists— seemingly against its own interests—that plaintiff's Complaint demands remedies including monetary damages, perhaps even *punitive* damages.  *See* Notice of Removal ¶¶ 25, 29–30; Def.'s Opp'n at 6–7, 17–19, 21–23, 25.  Plaintiff, however, insists that "this is a CPPA action for injunctive relief only," Pl.'s Mot. at 13, and even attaches to its motion a declaration by its executive director expressly attesting that plaintiff "does not seek statutory or punitive damages on behalf of the general public," Pl.'s Mot., Ex. 2, Decl. of Jaclyn Bowen ¶ 5, ECF No 8-2.  Defendant's manufacturing of a disagreement on such a basic attribute of the Complaint as the relief sought is a transparent effort to support its desired removal to this Court, but this effort cannot be sustained.

The Complaint's Prayer for Relief expressly lists the four forms of relief sought by plaintiff: (1) a "Declaration that [defendant's] conduct is in violation of the CPPA," (2) an "Order enjoining [defendant's] conduct found to be in violation of the CPPA," (3) an "Order

requiring [defendant] to provide corrective advertising to the residents of the District of Columbia that restores consumers," and (4) an "Order granting Plaintiff's costs and disbursements, including reasonable attorneys' fees and expert fees, and prejudgment interest at the maximum rate allowable by law."  Compl. at 28 (Prayer for Relief).  Critically, plaintiff makes no express demand for statutory damages, money damages, restitution, or any other form of monetary award to consumers.[11]

Defendant's argument in support of its attempt to expand the scope of relief sought by plaintiff rests entirely on the opening clause of the Complaint's Prayer for Relief: "Plaintiff prays for judgment against Defendant including the remedies available under D.C. Code § 28-3905(k)(2)(B-F)."  Compl. at 28 (Prayer for Relief); Def.'s Opp'n at 18–19.  As relevant here, the statute's enumeration of possible forms of relief contains six sub-sub-subsections labeled "A" through "F," as follows:

> (A)(i) Treble damages, or $1,500 per violation, whichever is greater, payable to the consumer;
>
> (ii) Notwithstanding sub-subparagraph (i) of this subparagraph, for a violation of § 28-3904(kk) a consumer may recover or obtain actual damages. Actual damages shall not include dignitary damages, including pain and suffering.
>
> (B) Reasonable attorney's fees;
>
> (C) Punitive damages;
>
> (D) An injunction against the use of the unlawful trade practice;

---

[11]    Defendant argues in passing that even if a complaint does not plead a particular remedy such as money damages, what matters is what the complaint *could* plead under "the pertinent state procedural mechanism at issue." Def.'s Opp'n at 18.  Put another way, this peculiar proposition would in some circumstances allow a defendant to manufacture federal jurisdiction by voluntarily inviting the court to subject it to relief that a plaintiff expressly does not seek.  Such a counterintuitive result demands some supporting authority or rationale, and defendant offers none. The lone citation defendant offers in "support," *West Virginia v. CVS Pharmacy, Inc.*, 646 F.3d 169, 172 (4th Cir. 2011), points to a page that not only contains nothing relevant to this proposition but also delivers a conclusion that the action at issue there "is *not* a 'class action' as defined by CAFA," *id.* (emphasis added).

> (E) In representative actions, additional relief as may be necessary to restore to the consumer money or property, real or personal, which may have been acquired by means of the unlawful trade practice; or
>
> (F) Any other relief which the court determines proper.

D.C. Code § 28-3905(k)(2).  Defendant emphasizes that the Complaint's citation to sub-sub-subsections "B–F" not only encompasses such monetary relief as "[p]unitive damages" and "relief as may be necessary to restore to the consumer money," but also conspicuously omits the statutory damages allowed by sub-sub-subsection "A."  *See* Def.'s Opp'n at 18–19.  Defendant views plaintiff's motion to remand and accompanying Declaration as an unavailing attempt to "amend the Complaint in the pleadings in support of the motion."  *Id.* at 18 (citation omitted).  Plaintiff, for its part, denies any such amendment and argues that the Declaration merely "re-confirms the relief sought in its Prayer for Relief as Defendant continually and willfully misconstrues the requested relief."  Pl.'s Reply Def.'s Opp'n Pl.'s Mot. Remand ("Pl.'s Reply") at 17, ECF No. 13.

Defendant's reasoning proceeds as follows: (1) plaintiff seeks relief including "the remedies available under D.C. Code § 28-3905(k)(2)(B–F)"; (2) the remedies listed in the cited range of statutory text include punitive and other monetary damages awardable to consumers; (3) *ergo*, plaintiff seeks monetary damages.  Further, if plaintiff's disclaimer of such damages in the course of briefing the instant motion were construed as a post-removal "amendment" to the original Complaint, that would not defeat federal jurisdiction here.  *See Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 474 n.6 (2007) ("[W]hen a defendant removes a case to federal court based on the presence of a federal claim, an amendment eliminating the original basis for federal jurisdiction generally does not defeat jurisdiction.").  This principle also holds where, as in CAFA actions, federal jurisdiction is constitutionally based in diversity as opposed to a federal

question.  *See Bronner v. Duggan*, 962 F.3d 596, 603–04 (D.C. Cir. 2020) (noting that *Rockwell*'s distinction between removal cases and those originally filed in federal court need not be so cabined).  Thus, if plaintiff simply changed its mind about money damages after removal, such action fails to destroy CAFA jurisdiction.

Defendant's logic rests, however, on a flawed reading of the Complaint. The better reading of the Complaint is that plaintiff never sought money damages, and plaintiff's Declaration simply confirms that construction without attempting to change the contours of the Complaint.  As written, the Complaint seeks relief "including the remedies available under D.C. Code § 28-3905(k)(2)(B-F)," followed by a colon and then an enumeration of four specific remedies that do not include money damages.  Compl. at 28 (Prayer for Relief).[12]  The colon and the placement of the word "including" are, together, dispositive and confirm that the Declaration is no mere *post hoc* attempt to change the meaning of the Complaint.[13]  The colon makes clear that plaintiff's set of four enumerated remedies *is* how the Complaint renders "the remedies available under D.C. Code § 28-3905(k)(2)(B–F)" as relevant to this case.[14]  Meanwhile, the placement of the word "including" *before* "the remedies available" makes clear that the enumerated remedies are those which plaintiff hopes to be included in the "judgment against Defendant," as opposed to merely examples of potential forms of relief.  Had "including" immediately preceded the colon, suggesting that what followed was a list of examples, defendant

---

[12]    The Prayer does not include the common invitation to fashion any other remedies the Court deems proper.

[13]    At times, cases indeed turn on a single piece of punctuation.  *See, e.g.*, *O'Connor v. Oakhurst Dairy*, 851 F.3d 69, 70 (1st Cir. 2017) ("For want of a comma, we have this case.").

[14]    The enumerated remedies are plausibly within the space of what § 28-3905(k)(2)(B–F) can offer.  A declaration that defendant's conduct violates the CPPA and an order enjoining such conduct collectively falls into (k)(2)(D) ("injunction against the use of the unlawful trade practice").  An order requiring corrective advertising falls within the catch-all of (k)(2)(F) ("[a]ny other relief which the court determines proper").  Finally, attorney's fees are expressly listed in (k)(2)(B).

could have a more plausible argument that plaintiff hoped stealthily to keep the space of possible remedies wide open.[15]

To be sure, the Complaint's citation to "(B–F)" is, as this dispute reflects, somewhat inartful drafting.  A more precise presentation might have cited to "§ 28-3905(k)(2)(B), (D), (F)" to explicitly denote only the specific relevant sub-sub-subsections.  Better still, plaintiff could have appended to each of its four enumerated remedies the precise statutory citation applicable to that particular remedy.  By failing to do so, plaintiff unwittingly invited a dose of nitpickery.

In a last-ditch effort to salvage its strained interpretation of the Complaint using logic that vaguely resembles the principle *expressio unius est exclusio alterius*, defendant suggests that by citing to "(B–F)" as opposed to the entirety of (k)(2), plaintiff's express omission of "A"— statutory or actual damages—must mean that plaintiff affirmatively wishes to invoke "C" (punitive damages) and "E" ("restore to the consumer money").  *See* Def.'s Opp'n at 18–19.  This argument is plausible but ultimately unconvincing.  Given that plaintiff does rely on sub-sub-subsections "B" (attorney's fees) and "F" (other relief) as well as "D" in between (injunction), plaintiffs use of a citation range, "B–F," that both starts and ends with relevant sub-sub-subsections is best read as somewhat sloppy shorthand rather than as an invocation of each and every piece of statutory text in between.

---

[15]     Other statements in the Complaint further weigh against viewing the requested remedies as including money damages.  In an allegation separate from the Prayer, plaintiff notes that it "brings this deceptive advertising and adulteration cause on behalf of themselves and the general public, and seek relief, including but not limited to, an injunction to halt Abbott's false and misleading marketing and sale of Abbott Products."  Compl. ¶ 42.  Further, plaintiff describes itself as an "advocate of the rights of consumers" for "truthful labeling and marketing," *id.* ¶ 56, with a mission "to educate the public and enable consumers to make informed shopping choices," *id.* ¶ 46.  Nothing about the framing of the Complaint or plaintiff's description of itself suggests that monetary recovery to consumers was desired, given that plaintiff's mission would seemingly be satisfied by forcing a change in defendant's labeling and marketing.

Plaintiff is not the party here trying to change the contours of relief sought in the original Complaint. Defendant's attempt to redefine the remedies sought is rejected, and analysis of the propriety of exercising CAFA jurisdiction is through the lens of the Complaint only seeking injunctive relief.[16]

### C.    Traditional Diversity

Finally, defendant argues in the alternative that even if neither federal question jurisdiction nor diversity jurisdiction via CAFA are applicable here, the requirements of traditional diversity jurisdiction, under 28 U.S.C. § 1332(a), are met when viewing this case as one between a lone plaintiff and defendant. *See* Def.'s Opp'n at 27–32. The requirements for diversity jurisdiction in a case between two parties are familiar: the parties must be "citizens of different States" and "the matter in controversy exceeds the sum or value of $75,000." 28 U.S.C. § 1332(a). Both prongs present problems for defendant's argument, but only the first is necessary to address.

The parties initially agreed that they were diverse, Def.'s Opp'n at 27; Pl.'s Mot. at 19, but this diversity of citizenship inquiry is not so easily resolved by simple consent of the parties. Rather, courts can—and *must*—consider *sua sponte* issues implicating their subject matter

---

[16]    Plaintiff accuses defendant of not only "play[ing] fast and lose [sic] in misrepresenting [plaintiff's] position" but also "willfully and blatantly making inaccurate statements to this Court in violation of its professional responsibility by quoting to words concerning relief for damages that do not exist in the Complaint." Pl.'s Reply at 16. In particular, plaintiff points to this statement in defendant's opposition: "CLP has prayed for 'consumer money' disgorgement and restitution here. D.C. Code § 28-3905(k)(2)(E) (cited in Compl. at Prayer)." Pl.'s Reply at 16 (quoting Def.'s Opp'n at 23). The Court agrees that defendant's characterization is misleading. Plaintiff did not expressly plead for "consumer money" nor implicitly make such a request. Furthermore, defendant's assertion that § 28-3905(k)(2)(E) is "cited" in the Complaint's prayer, and defendant's resulting attempt to put the *statutory* phrase "consumer money" into the mouth of plaintiff due to its citation to "(k)(2)(B–F)," is dubious indeed. Defendant's advocacy on this point is unhelpfully aggressive but the Court does not find defendant to have engaged in a pattern of "ethics violations before the tribunal," as plaintiff accuses. Pl.'s Reply at 16 n.23. Similarly, the Court declines to interpose itself in the mudslinging between the parties over defendant's suggestion that plaintiff's "interesting business model" involves, in essence, a "pay-for-play" scheme whereby purchasing a "certification" from plaintiff can insulate a manufacturer from litigation by plaintiff even if its products contain lead or cadmium. *See* Def.'s Opp'n at 3–4; Pl.'s Reply at 6.

jurisdiction.  *See Hertz Corp. v. Friend*, 559 U.S. 77, 94 (2010) ("Courts have an independent

obligation to determine whether subject-matter jurisdiction exists, even when no party challenges

it."); *Momenian v. Davidson*, 878 F.3d 381, 389 (D.C. Cir. 2017) (similar).  Contrary to the

parties' positions, public sources indicate that "Clean Label Project Foundation" and "Abbott

Laboratories Inc." are both incorporated in Delaware.  Pursuant to 28 U.S.C. § 1332(c)(1), for

the purposes of diversity jurisdiction, "a corporation shall be deemed to be a citizen of every

State and foreign state by which it has been incorporated and of the State or foreign state where it

has its principal place of business."  If plaintiff and defendant are both citizens of, *inter alia*,

Delaware, statutory diversity jurisdiction cannot lie absent any exception not applicable here.

To clarify the citizenship of the parties, the parties were directed to submit a statement

enumerating the place(s) of incorporation and the location of the principal place of business of

each of party, "together with a brief explanation as to the implications of the parties' citizenship

on plaintiff's pending Motion to Remand to D.C. Superior Court."  Min. Order (May 11, 2022).

The joint filing that ensued, *see* Joint Statement, not only failed to deliver the anticipated clarity

but also revealed a mess, of both parties' creation, that would seem right at home on a Civil

Procedure exam for first-year law students.

The parties' filing reveals three critical and undisputed facts, all of which are

corroborated by the public record: (1) plaintiff "Clean Label Project Foundation" is incorporated

in Delaware, Joint Statement at 1; (2) "Abbott Laboratories," with no "Inc." or other suffix, is

incorporated in Illinois, *id.* at 2, 5–6; and (3) "Abbott Laboratories Inc.," with no comma

preceding the "Inc.," is incorporated in Delaware, *id.* at 5, 6.  Abbott Laboratories Inc., the

Delaware entity, is a wholly owned subsidiary of the Illinois parent company Abbott

Laboratories.  Joint Statement at 4–5.  The problem, however, is that the parties now cannot

agree on *who the defendant is*—a serious problem since the presence of "Abbott Laboratories

Inc." as a defendant would destroy diversity on account of the Delaware citizenship it has in

common with plaintiff.  Both parties now present unconvincing *post hoc* explanations of who

they believe the named defendant has been, or should have been, all along—specifically, "Abbott

Laboratories," "Abbott Laboratories Inc." (collectively, the "Abbott Entities"), or both.

The record is, to be sure, less than crystal clear.  On the one hand, the case caption in the

Complaint and every substantive filing in this docket from either party lists "Abbott

Laboratories, Inc." as the defendant, a name which because of the comma matches neither of the

Abbott Entities but is clearly a closer match for "Abbott Laboratories Inc.," the Delaware

corporation.[17]  The same name appears on the Summons and on the signed Affidavit of Service.

*See* pages 42, 44 of ECF No. 1-2.  On the other hand, the body of the Complaint itself names

"Abbott Laboratories" as the defendant, without expressly stating whether that purports to be the

full entity name or shorthand that omits the "Inc."  Compl. at 1.  Further confusing matters, as

defendant points out, the "information sheet," "complaint" form, and "verification" filed in

---

[17]     Defendant argues that the caption is not determinative because "it is the actual allegations in [plaintiff's]
complaint about the defendant that control, not [plaintiff's] typographical error in the case caption."  Joint Statement
at 4.  As support for its call to disregard the Delaware defendant named in the caption, however, defendant invokes
cases that are inapposite here.  *See* Joint Statement at 4 (citing collection of three cases themselves cited in *Ford
Motor Co. v. Versata Software, Inc.*, No. 15-cv-10628, 2018 U.S. Dist. LEXIS 126403, at *9 n.2 (E.D. Mich. June 5,
2018)).  Specifically, the three cases defendant cites indirectly via *Ford*, are: (1) *Eberhard v. Old Republic National
Title Insurance Co.*, No. 1:11-cv-834, 2013 WL 12293449 (N.D. Ohio Sept. 13, 2013), in which the court held that a
defendant appearing in allegations of the complaint but *omitted* in the caption was a party to the case, *id.* at *5–6;
(2) *Rice v. Hamilton Air Force Base Commissary*, 720 F.2d 1082 (9th Cir. 1983), in which the Ninth Circuit held
similarly in a case where it was "undisputed that the improper defendant was named" in the caption, *id.* at 1085; and
(3) *Gilreath v. North Carolina ex rel. Cumberland Cty. Bd. of Educ.*, No. 5:11-cv-627, 2012 WL 1219765 (E.D.N.C.
Apr. 10, 2012), in which the *plaintiff* was permitted to amend a complaint to, *inter alia*, repair a faulty caption in
which the named defendant was "not a legal entity," *id.* at *4.  None of these cases addresses the situation here
where *defendant* unilaterally seeks functionally to strike the named defendant in the caption even though that named
defendant is an extant legal entity and an entirely plausible party in interest.  While true that, as defendant notes,
"the leading federal treatise on federal practice and procedure" observes that the caption is not necessarily
"determinative" of party identity and thus of subject matter jurisdiction, Joint Statement at 4 (citing 5A WRIGHT &
MILLER, FEDERAL PRACTICE & PROCEDURE § 1321 (4th ed., Apr. 2022 update)), that treatise, too, describes a
collection of cases *declining to omit* a party not named in the caption rather than disregarding an extant, relevant
party who is actually named.

Superior Court identify only "Abbott Laboratories."  Joint Statement at 3; *see also* pages 33–37 of ECF No. 1-1.  All told, the identity of the intended defendant is somewhat ambiguous on the face of the papers, but the more logical reading is that the Delaware entity "Abbott Laboratories Inc." was the intended defendant for one simple reason: "Abbott Laboratories" is a reasonable (albeit, under the circumstances, highly imprecise), less-formal rendering of "Abbott Laboratories Inc.," but *not vice versa*—to say "Abbott Laboratories, Inc." when meaning only "Abbott Laboratories" is simply incorrect.[18]  Simply put, as plaintiff admits, it "mistook both names for the same entity," Joint Statement at 6, a sloppy but understandable mistake given the Abbott Entities' confusing choice to name themselves this way.  The analysis should end here, with the result that there is no diversity, but neither party is apparently content to leave well enough alone.

Defendant wishes away the "Inc." as a "typographical error," Joint Statement at 5, but offers no credible explanation for this assertion—particularly where the purported "typo" results not in nonsense but rather in a reference to an actual, relevant corporate entity.  Defendant seizes on the Complaint's allegation that "Abbott was an Illinois-based corporation," *id.* at 2 (quoting Compl. ¶ 52), one "alleged to be incorporated in Illinois," *id.*, as evidence that the Illinois "Abbott Laboratories," *sans* "Inc.," has been the defendant all along, but this contention does not withstand scrutiny.  The Complaint did *not* allege that defendant was a corporation incorporated in Illinois, or an "Illinois corporation," but rather that it was an "Illinois-*based* corporation that maintains its principal place of business and headquarters" in "Abbott Park, Ill 60064," Compl.

---

[18]     Defendant helpfully explains an Illinois peculiarity in corporate nomenclature, but the very need for that explanation is revealing.  "Under applicable Illinois corporate law, Abbott Laboratories does not need to (and doesn't) use a corporate form identifier such as 'Inc.' in its registered name.  *Illinois law is different* from Delaware and certain other state laws in this regard."  Joint Statement at 2 (emphasis added).  Given that Illinois law seems to stray from the beaten path, it is understandable why a litigant might believe that "Abbott Laboratories" is not the full name of any entity.

¶ 52 (emphasis added), a description apt for both of the Abbott Entities.  The description of where a company is "based," as a matter of common usage, describes where the company operates, does business, and is part of the community, not the more critical legalistic matter of the state in which a company's incorporation paperwork is filed.  Furthermore, given that plaintiff filed this action in Superior Court, plaintiff had no need to allege the state of incorporation as it did not seek to invoke federal jurisdiction.  Accordingly, this allegation does nothing to disambiguate the identity of the intended defendant.

Plaintiff, for its part, instead of maintaining the simple position that the defendant has always been "Abbott Laboratories[] Inc." (albeit rendered with an erroneous stray comma), now asserts that the Complaint "named both Abbott Laboratories and Abbott Laboratories Inc. as defendants"—plural.  Joint Statement at 6.  Indeed, in its section of the Joint Statement plaintiff now, for the first time, repeatedly refers to "Defendants."  Plaintiff does not seek to amend the Complaint to make this change, but rather maintains that it has always been this way.  This interpretation cannot be squared with the Complaint, which generally refers to a single defendant, Compl. ¶ 52, uses singular verbs such as "was" when describing the defendant and "markets" when describing the defendant's actions, *see, e.g.*, Compl. ¶¶ 52–53, and calls the defendant "a 'person'" for legal purposes, Compl. ¶ 136.[19]

---

[19]      Consider an analogous and commonplace scenario that demonstrates the absurdity of both parties' positions: a family with a father and a son with the same name, but with the son bearing a "Jr." suffix.  Here, just as with the Abbott Entities, the parent has the same name as the child, minus a suffix.  If one mentions, say, "John Doe," one could easily be referring to either the father or the son.  If one mentions "John Doe, Jr.," however, this clearly refers only to the son.  Now imagine that in the course of a single conversation, a speaker mentions "John Doe, Jr." exactly one time and then every time thereafter refers only to "John Doe," in the singular, without ever suggesting that the two names refer to two different people.  The most natural interpretation, without more information, is that the speaker is discussing John Doe, Jr. throughout.  Defendant's approach, however, would dismiss the "Jr." out of hand as a verbal slip-up.  Plaintiff, meanwhile, would assert that the entire conversation referred to both the father *and* the son.  Neither approach is reasonable.

Defendant correctly points out that in its corporate disclosure statement filed in December 2021 in this Court, it identified (albeit rather discreetly, in a footnote) the distinction between the Abbott Entities, suggesting in essence that plaintiff has since been on notice that the "Inc." has been misplaced all along.  Joint Statement at 4–5 (citing Def. Abbott Laboratories' Rule 7.1 Corporate Disclosure Statement ("R7.1 Statement"), ECF No. 2).  Defendant did indeed identify this issue at an early stage, stating: "The proper party in interest in this matter is Abbott Laboratories, which is the entity named in the body of Plaintiff's Complaint; however, Plaintiff has named Abbott Laboratories, Inc. in the case caption of its Complaint."  R7.1 Statement at 1 n.1.  Defendant also mentions this issue in passing in its briefing on the pending motions.  Def.'s Opp'n at 1 n.2 ("CLP names as defendant 'Abbott Laboratories, Inc.,' an Illinois corporation with principal place of business in Illinois.  The proper name of the entity Abbott believes CLP intends to sue is 'Abbott Laboratories.'"); Def.'s Mem. Supp. Mot. Dismiss at 1 n.1, ECF No. 11-1 (same).  None of this helps defendant's position now.  To the contrary, defendant's previous statements about the Abbott Entities suggest that defendant recognized, and tried to bury, a potentially serious problem involving this Court's subject matter jurisdiction.

Critically, none of defendant's four separate assertions that "Abbott Laboratories" is the proper defendant entity is backed by any information about *why* it believes this is so or why if any Abbott Entity is to be liable at all it would be the Illinois entity.  Even now, when the Court has signaled that subject matter jurisdiction is not a sure thing, defendant offers no facts about, for example, who manufactures Alimentum, who handles marketing for Alimentum, or who gets paid when a consumer purchases Alimentum in the District of Columbia.  Without more, the Court is left to conclude that the only reason defendant views the Illinois entity as a more appropriate defendant than its Delaware subsidiary is that the former preserves diversity

jurisdiction while the latter destroys it.  The entity naming schema devised by defendant has

operated, in federal diversity litigation, to result, as here, in unnecessarily confusing positions, or

worse, appears to be deliberately ambiguous so as to allow defendant to manufacture federal

jurisdiction when useful to do so.  Courts and opposing litigants should take careful notice.

Interestingly, in some other active litigation where defendant faces Similac-related claims

but where the distinction between the Abbott Entities does not matter for diversity purposes,

defendant seems to take no issue with the named defendant being the Delaware entity.  *See, e.g.*,

Abbott's Mem. Supp. Mot. Dismiss & Strike, *Hunte v. Abbott Labs., Inc.*, No. 3:20-cv-1626 (D.

Conn. Apr. 1, 2021), ECF No. 45-1 (arguing as "Abbott Laboratories, Inc." without comment on

the entity name); Reply. Supp. Def. Abbott Laboratories Inc.'s Mot. Dismiss Pl. Giovanna

Smith's First Am. Compl. Pursuant to Fed. R. Civ. P. 12(b)(6), 9(b), & 12(b)(1), *Smith v. Abbott*

*Labs., Inc.*, No. 1:20-cv-5684 (E.D.N.Y. Sept. 16, 2021), ECF No. 31 (replying in support of

"Abbott Laboratories Inc.'s Motion" and bearing a signature block of "Attorneys for Abbott

Laboratories Inc.").  Perhaps there is a good reason why the Delaware entity is an appropriate

defendant in some Similac cases while the Illinois parent is the only correct defendant here, but

if that reason exists it has not been shared with the Court.  A skeptical observer might wonder if

the existence of a Delaware plaintiff is the true and only reason defendant differentiates the

Abbott Entities.

Notably, when defendant identified the entity issue in briefing on two of the pending

motions, defendant incorrectly represented that even "Abbott Laboratories, Inc." is "an *Illinois*

*corporation* with principal place of business in Illinois."  Def.'s Opp'n at 1 n.2 (emphasis

added); Def.'s Mem. Supp. Mot. Dismiss at 1 n.1 (same).[20]  Even if inadvertent, this

---

[20]     Plaintiff also suggests that defendant made an "incorrect statement[]" in its Notice of Removal by
identifying itself as an "Illinois corporation."  Joint Statement at 7 (quoting Notice of Removal ¶ 26).  While to be

representation is troubling for several reasons.  First, and most importantly, insofar as "Abbott

Laboratories[] Inc." is the defendant this statement, if left unchallenged, could have steered the

Court into the fraught territory of exercising jurisdiction where none exists.  Second, the

statement appears in defendant's opposition to plaintiff's motion to remand, a filing where non-

CAFA diversity jurisdiction is explicitly at issue and attention to detail as to party citizenship is

of paramount importance.  Finally, even once the Abbott Entities confusion was brought to the

foreground in the Joint Statement filed in response to this Court's order, defendant neither

acknowledged nor corrected this critical misstatement.[21]  None of this is acceptable.

In any event, the conclusion is straightforward: diversity jurisdiction is not established.

The Complaint is most reasonably read as intending to sue the Delaware entity "Abbott

Laboratories Inc."  To the extent any ambiguity persists, "any ambiguities concerning the

propriety of removal" militate "in favor of remand."  *Animal Legal Def. Fund*, 249 F. Supp. 3d at

56 (citation omitted).  Further, even if defendant had a colorable argument the Complaint should

be construed differently, defendant has utterly failed—even with the opportunity provided for

supplemental briefing on the topic—to meet the burden it bears as the removing party to show by

a preponderance of the evidence that the parties are diverse.

\*   \*   \*

This Court lacks subject matter jurisdiction over this matter on any of the grounds

defendant proposes—federal question, CAFA, or ordinary diversity jurisdiction—and therefore

---

true this statement requires the premise that "Abbott Laboratories" is the defendant and not "Abbott Laboratories Inc.," a matter not raised in the Notice, this representation is at least consistent with defendant's contemporaneous identification of the entity issue in its corporate disclosure statement.

[21]     The Joint Statement itself, however, correctly identifies the Delaware incorporation of "Abbott Laboratories Inc."  Joint Statement at 5 n.2.

this case must be remanded to Superior Court.  As a result, this Court need not—and cannot—weigh in on the merits of the case so its analysis must stop here.

**IV.     CONCLUSION**

For the foregoing reasons, plaintiff's Motion to Remand is GRANTED.  Accordingly, defendant's Motion to Dismiss, the Request for Judicial Notice contained therein, and plaintiff's Motion to Strike are all DENIED AS MOOT.

An Order consistent with this Memorandum Opinion will be entered contemporaneously.


Date: May 25, 2022

_____
BERYL A. HOWELL
Chief Judge